```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

TIMOTHY PEARSON,                :         NO. 1:08-CV-00881
                                :
    Plaintiff,                  :
                                :
    v.                          :         **OPINION AND ORDER**
                                :
FORD MOTOR COMPANY,             :
                                :
    Defendant.                  :

       This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 22), Plaintiff's Response in Opposition (doc. 28), and Defendant's Reply (doc. 30). Also before the Court is Defendant's Motion to Strike (doc. 31), Plaintiff's Response in Opposition (doc. 33), and Defendant's Reply (doc. 36). The Court held a hearing on these matters on August 17, 2007. For the reasons indicated herein, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment, such that Plaintiff's public policy claim is dismissed, but Plaintiff's retaliation claims survive. The Court further GRANTS IN PART and DENIES IN PART Defendant's Motion to Strike, as detailed herein.

**I. Background**

       Plaintiff Timothy Pearson, an African-American, worked as a production worker for Defendant Ford Motor Company for 28 years. Plaintiff contends that after Ronald Campbell, a Caucasion, became his supervisor in 2004, Plaintiff was blamed for the mistakes of Caucasion employees and targeted with written and oral discipline

(doc. 28). Plaintiff made complaints about workplace discrimination, ultimately filing three complaints with the Ohio Civil Rights Commission (doc. 2). Plaintiff alleges that the workplace became so bad for him that he went on disability leave and applied for short-term disability in February 2006 (doc. 28). Ford sent Plaintiff for an evaluation with Dr. Marcia Kaplan to determine whether Plaintiff was entitled to disability benefits (Id.). Dr. Kaplan reported by letter that Plaintiff expressed to her homicidal feelings and that he had considered going back to the plant with a gun so as to shoot his supervisor (Id.). According to Plaintiff, by deposition, he stated: "I said yes, I do have homicidal feelings. I'm angry, I'm upset...I said if I had a choice, I feel like going home and getting a gun and going back in the plant and shoot [sic] somebody. This is how I felt" (Id.). After Ford management saw Dr. Kaplan's letter, it terminated Plaintiff's employment, allegedly based on a zero tolerance policy with regard to workplace violence and threats of violence (Id.). At the time of his discharge, Plaintiff was two years short of vesting in optimal retirement benefits.

Plaintiff filed his Complaint in the Hamilton County Court of Common Pleas on April 2, 2008, alleging that he was wrongfully terminated for filing discrimination complaints, for taking leave, and that Defendant's actions amount to a violation of Ohio public policy (doc. 2). Defendant removed the action to this

2

Court in December 2008 (doc. 1). Plaintiff went through two attorneys, one of whom was disbarred, before being represented by current counsel (doc. 27).

On January 29, 2010, Defendant filed its motion for summary judgment, premised on the theory that its action in terminating Plaintiff was completely justified based on its zero tolerance policy for workplace threats (doc. 22). Plaintiff responded that Defendant did not have an honest belief that he posed a threat based on 1) the nature of his statements, and 2) the lack of any real "zero-tolerance policy" as evidenced by actual violence and threats that took place among Caucasion employees that did not result in terminations (doc. 28). Plaintiff further contends Defendant failed to give a fair reading of Kaplan's complete letter, which did not recommend Plaintiff's termination (Id.). Plaintiff attached to his Response a number of affidavits of his former co-workers and of himself (Id.). Defendant has replied (doc. 30), and has further moved to strike Plaintiff's affidavits (doc. 31). These matters are now ripe for the Court's consideration.

**II. Applicable Legal Standard**

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam).  In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by

4

merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive

summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the

6

Court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991).

**III. Analysis**

At the August 17, 2010 hearing it became clear to the Court that genuine issues of material fact exist as to whether Plaintiff's termination was the result of retaliation for his filing of discrimination claims and/or taking protected leave. Taking all inferences in the light most favorable to the non-moving party, as the Court is required to do upon a summary judgment motion, Matsushita Elec. Indus. Co., 475 U.S. 574, 587, the Court concludes a reasonable jury could find that Defendant retaliated against Plaintiff for his protected activity. The Court further concludes that a jury could find Defendant's principal argument, that it terminated Plaintiff because of a zero tolerance policy for threats of violence, has no basis in fact.

**A. Defendant's Motion for Summary Judgment (doc. 22)**

At the hearing and in its motion, Defendant made it abundantly clear that Plaintiff filed a claim for retaliation and not for race discrimination. The Court is cognizant of such fact but nonetheless will regard this case within the framework of all the evidence in the record. Although this is not an action for race discrimination, the evidence proffered by Plaintiff puts his comments to the psychiatrist into a context that Defendant could be

7

viewed to have a responsibility to understand. Plaintiff claims he was treated differently than Caucasion workers, and was even blamed for their mistakes. The record shows Plaintiff grieved such treatment, and Plaintiff's testimony is that he was so stressed out by abuses that he was forced to take disability leave. Moreover, Plaintiff proffers evidence casting into doubt the existence of Defendant's "zero-tolerance" policy as to threats of violence and violence, in the form of eyewitness testimony of white-on-white violence that did not result in employee discharges. All of these facts are properly within the background of this case, even if Plaintiff never explicitly pleaded race discrimination in his Complaint.

Plaintiff brings a claim for retaliation. To establish such a claim under state and federal law, Plaintiff must show 1) he engaged in protected activity, 2) Defendant took an adverse action against Plaintiff, and 3) a causal link exists between Plaintiff's protected activity and the adverse action. Russell v. National Amusements, Inc., No. 3:07-CV-3216, 2009 U.S. Dist. LEXIS 11598, *30-31 (N.D. Ohio Feb. 4, 2009), Jackson v. Champaign National Bank & Trust, No. 00AP-170, 2000 Ohio App. LEXIS 4390, *7 (Ohio Ct. App., Sept. 26, 2000).[1] The Court finds no dispute in the record

---

[1] As Defendant correctly noted in its motion, the standard for Family and Medical Leave Act retaliation is practically identical to the Title VII standard, in that Plaintiff must show that 1)he availed himself of a protected FMLA right, 2) that he was adversely affected by an employment decision, and 3) there is

that Plaintiff exercised protected rights in filing race discrimination charges and in taking medical leave. Although Defendant challenges the existence of a causal link, the Court notes that only two months elapsed between Plaintiff's filing of his second race discrimination charge and his termination. Although Defendant cites numerous authorities for the proposition that temporal proximity between protected activity and an adverse action is not enough to establish causation, the Court concludes Plaintiff has adduced evidence in addition to temporal proximity that a jury could consider supporting his retaliation claims.[2] Plaintiff cites a pattern of harassment that literally made him sick. Plaintiff alleges he was singled out to the point of being stressed out. Shortly after he challenged the alleged harassment

---

a causal connection between his protected activity and the adverse job action. Crofoot. v. MidMichigan Medical Center-Midland, No. 05-10032, 2007 U.S. Dist. LEXIS 23904, *17 (E.D. Mich. Mar. 30, 2007). Because the Court finds no dispute that Plaintiff properly exercised his FMLA rights, it will merge its analysis of Defendant's attack on both Plaintiff's Title VII and FMLA retaliation claims.

[2]Temporal proximity between an employer's knowledge of protected activity and an adverse employment action may be sufficient to allege a prima facie case of retaliation, however, that temporal proximity must be "very close." Clark County School District v. Breeden, 532 U.S. 268 (2001). In Clark County, the Supreme Court cited cases in which periods more than three months were considered insufficient, while it also cited Neil v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001) in which a period of one and a half months was considered sufficient evidence of causality. This Court finds the two months here, along with evidence throwing Defendant's proffered justification into question, amount to a showing of causation sufficient to meet the prima facie case.

for a second time, he was fired, based on the purported violation of a policy that evidence shows others violated without discharge. As Plaintiff's counsel put it at the hearing, "they did not want him around anymore because he had been a burr in their saddle because of these charge filings, and the jury is entitled to understand that."  The Court agrees the jury is entitled to consider Plaintiff's prima facie retaliation case.

Having sufficiently established a prima facie case, the burden shifts from Plaintiff to Defendant, who must articulate a legitimate, nondiscriminatory business reason for its termination decision. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  In this case, Defendant claims it terminated Plaintiff due to its honestly held belief that Plaintiff threatened to bring a gun to work and shoot his supervisor, a violation of its zero tolerance policy (doc. 30, citing Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998)(an employer's proffered reason is honestly held if it reasonably relied on the particularized facts that were before it at the time the decision was made)).³

---

³Defendant further argues (doc. 30), that supervisor Ron Campbell had nothing to do with the decision to terminate Plaintiff, and Campbell's alleged discriminatory intent cannot be imputed to the decision-makers because Plaintiff has proffered no facts showing Campbell reported Plaintiff's threats of violence or knowingly failed to report threats of violence.  Defendant's argument strays from the point.  The issue is whether its termination of Plaintiff could be viewed as retaliation for Plaintiffs' successive filing of discrimination charges and/or taking protected leave.

At the hearing, Defendant stated that Plaintiff had a poor disciplinary record over the years of his employment. When the Court asked, "Why did they want to keep him as an employee if he did not have a good record for all these years," Defendant responded that absences and poor workmanship could be rectified. In contrast, Defendant stated, a threat to come to work and shoot a supervisor constitutes a violation of its zero tolerance policy for violence. Defendant further stated that it gave Plaintiff a chance for past aggressive behavior and an inappropriate statement that he "was going to get" his manager, threats which Defendant found to be indirect. However, in this instance, Defendant contended, it found the statement to Dr. Kaplan a direct threat that justified Plaintiff's termination. "We've all seen what has happened in recent history with violence in the workplace," Defendant stated, "and Ford takes this very seriously." In its motion, Defendant further cites to numerous authorities supporting the termination of an employee for violation of zero tolerance policies toward violence (doc. 22, fn. 12).

Plaintiff responded at the hearing that he had a good record for nearly thirty years, but that he was written up much more in recent years when Ron Campbell became his supervisor. Plaintiff argued he had no lawyer to assist him with the EEOC charges he filed, so when such charges went nowhere, he only became more and more frustrated with his work situation. Ultimately, he

contends, he was forced to go on disability. When Ford had Plaintiff see a psychiatrist so as to confirm his need for disability leave, Plaintiff indicates he candidly expressed his frustration. In his affidavit, Plaintiff indicates "I was just venting. . .I don't even own a gun. . .I would never seriously consider going to the plant and shooting anybody. I am not that kind of person." (doc. 28). Plaintiff further stated, "I did not have any particular person in mind. Dr. Kaplan probably thought I meant Ron Campbell since I had earlier in the conversation told her he was the supervisor that was picking on me because of my race" (Id.).

Plaintiff further argued at the hearing that the evidence shows Defendant did not fairly evaluate Dr. Kaplan's letter. In Plaintiff's view, as soon as Defendant saw "homicidal ideations," in the doctor's letter, it stopped reading. Plaintiff contended, "She goes on to say more than that. She did not say he should be fired. What she said was. . .I strongly recommend that he remain off at this time. Ideally in the near future he may need to be returned to work in a different area with a different supervisor, when he is able to return to work." The record also shows that Dr. Kaplan next suggested an adjustment in medication and a follow-up session in three-months time.

Having reviewed this matter, the Court concludes that a reasonable jury could find Defendant's justification for firing

Plaintiff questionable.  Of course, the jury might also agree with Defendant, but that is not the question before the Court.  This case does not involve a face-to-face threat in the workplace, nor does it involve an employee actually brandishing a weapon in the workplace.  A jury might find Ford's reaction unjustified, especially when the letter it relied upon recommended time off for Plaintiff,  when Plaintiff was on disability leave for mental stress due to alleged discrimination, and when Plaintiff was a decades-long employee on the cusp of gaining valuable retirement benefits.  A jury further might find persuasive Plaintiff's argument that in other cases of alleged threats of violence, employers took some independent steps such as interviewing the employee so as to make a good faith determination whether the employee constituted a threat.

The Court's conclusion is further bolstered by Defendant's reliance on its "zero tolerance" policy for violence or threats of violence as justification for Plaintiff's termination.  Plaintiff has proffered evidence showing other employees actually engaged in workplace altercations without facing termination.  Plaintiff further shows that the policy is more akin to a laundry list of "do's and don'ts, like don't smoke, don't run in the hallway. . .make sure you punch your time clock, don't fight, be nice to your fellow employee."  At the hearing, Plaintiff contended that this is not a zero tolerance policy, as "at the heading of the

13

policy it says that anyone who violates any one of these dictates is subject to discipline which may include discharge." A reasonable jury might very well find Defendant's invocation of a "zero tolerance" policy questionable when on the face of such policy discharge is in reality one option among others.

Finally, credibility determinations are in the province of a jury. A jury might find credible Plaintiff's testimony that he meant nothing by his remarks to Dr. Kaplan. Such a determination would further throw into question whether Defendant reasonably relied on particularized facts in believing that Plaintiff was a threat. For all of these reasons, the Court concludes that Defendant is not entitled to summary judgment as to Plaintiff's retaliation claims in this matter.

Defendant also challenges Plaintiff's claim for wrongful discharge in violation of public policy, in addition to Plaintiff's retaliation claims (doc. 22). Defendant contends that while employed with Ford, Plaintiff was a member of the union, Local 863 of the United Automobile Workers (Id.). Citing Haynes v. Zoological Soc. Of Cincinnati, 73 Ohio St.3d 254 (1995), Defendant contends that as a union member Plaintiff was not an at-will employee, and therefore, under the law he cannot assert a claim for wrongful discharge in violation of public policy. The Court agrees with Defendant and grants its motion as to such claim.

14

B.  **Defendant's Motion to Strike (doc. 31)**

Defendant attacks the affidavits Plaintiff used to oppose its motion for summary judgment, contending they are supported by inadmissible hearsay, opinions, unsupported conclusory allegations, and statements made without first-hand knowledge. Under Fed R. Civ. P. 56(e), affidavits used for summary judgment purposes must be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify.

The essence of each of the affidavits is that Plaintiff's co-workers of more than thirty years state he was a good worker, that everything changed when Ron Campbell became supervisor, and the affiants offer examples of situations they saw that show Defendant inconsistently enforced its "no-tolerance" policy of workplace violence and threats. Defendant attacks portions of the statements as hearsay and also attacks each affidavit as "self-serving," although Plaintiff's co-workers are not parties to this litigation and appear to have nothing to gain from testifying against Ford. Defendant proposes a remedy of striking the entirety of the affidavits, as opposed to redacting any of the offending portions. Finally, in its briefing, Defendant argues that it is unclear when the alleged events took place because each of the affiants had been employees for some thirty years. As such, Defendant opines that the events the affiants claim to have witnessed could very well have predated the existence of Ford's

15

zero-tolerance policy.

Plaintiff responds that none of the paragraphs should be stricken as they are made on personal knowledge, they state facts that would be admissible in evidence, and the affiants are competent to testify the matters stated therein. At most, Plaintiff contends, the arguments of Defendant go to the weight of the statements of the affiants, not their admissibility. At the hearing, Plaintiff conceded that one affiant's reference to a rumor is "admittedly problematic," but that such reference was corroborated by another affiant's eyewitness account.

The Court has reviewed the affidavits and notes the following: Plaintiff proffers an affidavit from fellow employee Gary Bowling, who states he witnessed an employee threaten to "go postal"[4] against another employee, but that the offending employee was not terminated, but only suspended one week. Plaintiff further proffers the affidavit of Aaron Cook, another co-worker of Plaintiff, who "saw Plant Manager Tom Tiemann place a lower level

---

[4]At the hearing Plaintiff's counsel defined "going postal" as slang for taking violent action against someone. According to the Report on the United States Postal Commission on a Safe and Secure Workplace, Introduction (August 31, 2000), "Going postal is a myth, a bad rap. Postal workers are no more likely to physically assault. . .their coworkers than employees in the national workforce." Nonetheless, subsequent to some twenty incidents between 1986 and 1997 in which postal-worker spree killers gunned down more than forty people, the term "going postal" has come to mean "insanely or murderously violent." Definition of postal, available at: http://merriam-webster.com/dictionary/postal.

16

supervisor in a choke hold and start rubbing his knuckles into the other guy's head. The supervisor started complaining that it really hurt. Tiemann responded that it was supposed to hurt." According to Plaintiff's counsel, "The plant manager is still there, and therefore he wasn't fired." Finally, Plaintiff proffers the affidavit of co-worker Timothy Vinegar, who stated that he witnessed a supervisor named Kelly have "a work-related argument with a female employee, during which time he grabbed her shoulders and shook her. She complained but he was not fired." Vinegar also witnessed "Scott Meyers getting in the face of Ron Campbell and screaming at him. Campbell screamed back at him. By their body language and gestures it looked like either one of them was on the verge of punching the other."

The Court finds the above sworn statements by co-workers admissible, and believes a jury could find the testimony of the affiants adequately shows Defendant did not have a <u>bona fide</u> zero tolerance policy for threats of violence and violence. The Court further rejects Defendant's argument that the Court should strike the entirety of the proffered affidavits due to defects with some of the statements contained therein. Finally, the Court rejects Defendant's argument that the affidavits are lacking in specificity as to when the events took place, and thus such events could very well have predated the existence of its zero tolerance policy. Because a jury could find no real zero tolerance policy ever

17

existed, such argument falls flat. To the extent that the moment that such events took place is relevant, Defendant should be able to obtain clarification on cross-examination.

Accordingly, the Court denies Defendant's motion to strike Plaintiff's affidavits, with the narrow exception of paragraph 9 of Gary Bowling's affidavit, that references a rumor. The Court does not find Defendant's arguments as to the balance of the affidavits well-taken, and the testimony of the affiants as to what they witnessed is admissible for the jury's consideration.

**IV. Conclusion**

The Court is well aware of the sensitive nature of threats of workplace violence. Employers are justified in protecting their employees from such threats. It may even be that a jury would find as much in this matter as to Defendant Ford. However, the Court finds reasonable questions as to the nature of Plaintiff's statements, including that they were made off-site, that he made them to a psychiatrist, and that even the psychiatrist did not envision Plaintiff's termination as necessary. Moreover, in the Court's view, a reasonable jury might find questionable Defendant's alleged reliance on its "zero tolerance" policy, that could be viewed as nonexistent. Should a jury arrive at such conclusions, it could reasonably conclude Defendant retaliated against Plaintiff for his protected activities.

Accordingly, and for these and all the reasons indicated

herein, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment (doc. 22), to the extent that it DISMISSES Plaintiff's public policy claim, while Plaintiff's FMLA and Title VII Retaliation claims survive Defendant's challenge. The Court further DENIES IN PART Defendant's Motion to Strike Plaintiff's Affidavits (doc. 31), with the exception of paragraph 9 of Gary Bowling's affidavit, that references a rumor. The Court GRANTS IN PART Defendant's Motion to Strike as to such paragraph, and STRIKES it from the record. Plaintiff will not be permitted to use such testimony at trial. Finally, the Court SCHEDULES the final pretrial conference in this matter for 11:00 A.M. on December 21, 2010, and sets the three-day jury trial to commence January 18, 2011, on an on-deck basis.

SO ORDERED.


Dated: October 5, 2010        s/S. Arthur Spiegel
                              S. Arthur Spiegel
                              United States Senior District Judge